# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 7530 | **DATE** | 9/12/2003 |
| **CASE TITLE** | Plaintiffs A,B,C vs. Zemin | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____ .

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____ .

(4) ☐ Ruling/Hearing on _____ set for _____ at _____ .

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(7) ☐ Trial[set for/re-set for] on _____ at _____ .

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____ .

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth on the attached Memorandum Opinion and Order, the Court recognizes Jiang Zemin's head of state immunity and dismisses the claims against him. The Court also dismisses the claims against defendant Falun Gong Control Office for lack of personal jurisdiction. Judgement is entered dismissing the plaintiffs' claims. All pending motions (3-1, 11-1, 11-2, 18-1, 18-2) are terminated.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | SEP 1 5 2003 | | |
| ✓ | Docketing to mail notices. | | date docketed | | |
| | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | docketing deputy initials | | |
| OR | courtroom deputy's initials | U.S. DISTRICT COURT | date mailed notice | |
| | | 03 SEP 13 PM 3:02 | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

PLAINTIFFS A, B, C, D, E, F, and OTHERS )
SIMILARLY SITUATED, WEI YE, and )
HAO WANG, )
        )
       **Plaintiffs,** )
        )
       **vs.** )       **Case No. 02 C 7530**
        )
JIANG ZEMIN and FALUN GONG )
CONTROL OFFICE )
(A.K.A. OFFICE 6/10), )
        )
       **Defendants.** )

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Plaintiffs are practitioners of Falun Gong, a spiritual movement of Chinese origin, and are either current or past residents of China.[1] Defendants are Jiang Zemin, the former President of the People's Republic of China, and the Falun Gong Control Office, an agency Jiang allegedly established for the purpose of suppressing the Falun Gong movement. The complaint alleges horrific human rights abuses suffered by plaintiffs A, B, C, D, E, and F at the hands of Chinese officials carrying out the dictates of the Falun Gong Control Office. Plaintiffs Wei Ye, a Chinese citizen residing in Illinois, and Hao Wang, a United States citizen residing in Massachusetts, allege defendants violated 42 U.S.C. § 1985 by attempting to obstruct their attempts to travel from the United States to Iceland in June 2002. Plaintiffs allege that defendants did so in order

---

[1] By request of certain plaintiffs, alphabetic designations have been used as a substitute for their names in the caption of this lawsuit. They sought this measure to protect them and their families, some of whom remain in China, from reprisal for filing this action.

to prevent them from attending protests against China's persecution of Falun Gong practitioners during Jiang Zemin's visit to Iceland.

Plaintiffs contend that the Court has jurisdiction of the case pursuant to the Alien Tort Claim Act, 29 U.S.C. § 1350, which confers original jurisdiction in the district courts over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."[2] They maintain that jurisdiction exists because they allege violations of both customary international law and *jus cogens* norms as well as treaties the United States has ratified. Specifically, the complaint contains claims for torture; genocide; violation of the right to life; violation of the right to liberty and security of the person; arbitrary arrest and imprisonment; violation of the right to freedom of thought, conscience, and religion; and conspiracy to commit violations of civil rights within the United States.

Defendants have not responded to the complaint, and plaintiffs have moved for entry of an order of default. The case is before the Court for consideration of preliminary jurisdictional matters. The United States government has intervened as an *amicus curiae* pursuant to 28 U.S.C. § 517, which permits the government to "attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States." In its *amicus* submission, the government suggests that Jiang is immune from suit based on his status as China's former head of state. Alternatively, the government

---

[2]Plaintiffs maintain that jurisdiction also exists by virtue of the Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992), codified at 28 U.S.C. § 1350 note. The TVPA is not, however, a jurisdictional statute. *Cf. Al Odah v. United States*, 321 F.3d 1134, 1146 (D.C. Cir. 2003) ("The Torture Victim Act does not contain its own jurisdictional provision."). Rather, the statute creates a cause of action for torture and extrajudicial killings. H.R. Rep. No. 102-367, pt. 1, at 3 (1991).

urges the Court to vacate an order entered by another judge of this Court, acting as emergency judge, which authorized plaintiffs to serve Jiang by alternate means, or to quash service because of alleged defects. Thirty-eight members of the United States Congress have also submitted an *amicus* brief urging the Court to exercise jurisdiction over defendants.

## BACKGROUND

The complaint alleges the following factual background. In March 1993, defendant Jiang assumed the offices of President of the People's Republic of China and Chair of the country's Central Military Committee. In 1997, he also became the Secretary General of the Central Committee of the Chinese Communist Party, which for over fifty years has been the dominant political party in China.[3] In November 2002, Jiang resigned his post as head of the Party, and on March 15, 2003, he stepped down as president of China

Plaintiffs contend that in June 1999, Jiang embarked on a campaign to eliminate the practice of Falun Gong in China. To this end, on June 10, 1999 Jiang established the Falun Gong Control Office, which plaintiffs claim is a subdivision of the Chinese Communist Party. They claim Jiang created this entity, known as "Office 6/10" in commemoration of the date of its inception, to organize and direct the suppression of Falun Gong throughout China. Office 6/10 has local branches in each province and city of China. Plaintiffs allege that according to the charter of one local office, the regional branches' responsibilities include "implement[ing] the decisions from the Central Committee of the Chinese Communist Party regarding preventing and dealing with Falun Gong and other evil cults." Compl. ¶ 30 (quoting local charter) (internal

---

[3] Most Americans believe, or at least assume, that the Chinese Communist Party is the only political party in China, but an affidavit from an American scholar on China submitted by plaintiffs suggests that this is not so. Aff. of Andrew Nathan ¶ 4.

3

quotation marks omitted). In July 1999, Jiang is claimed to have issued an edict outlawing Falun Gong as a threat to the Chinese government and people and ordering it suppressed by any means. Plaintiffs allege that he caused the Ministry of Public Security to issue a list of prohibitions that made illegal many activities engaged in by Falun Gong practitioners, including speaking out in defense of the movement. Jiang also allegedly ordered China's legislative body, the National People's Congress, to pass a series of retroactive laws ostensibly legitimizing this crackdown. Plaintiffs allege that the suppression has been marked by atrocities – arrest without trial, execution, rape, disappearance, forced labor in work camps, and torture of thousands of Falun Gong practitioners.

Plaintiffs filed this lawsuit under seal on October 18, 2002. Knowing that Jiang would be visiting Chicago on October 22 and 23, 2002, plaintiffs moved *ex parte* for leave to effect service on defendants by alternate means. Judge William J. Hibbler, acting as emergency judge in our absence, granted the motion and entered an order permitting service to be achieved by delivering a copy of the summons and complaint "to any of the security agents or hotel staff helping to guard" Jiang during his stay in Chicago. Order of Oct. 21, 2002. Plaintiffs contend that they properly effectuated service by delivering the documents to a Chicago Police commander stationed at Jiang's hotel and to agents of the United States Secret Service assigned to guard Jiang.

## DISCUSSION

### A.     Head-of-State Immunity

In its *amicus* submission, the government suggests that Jiang is immune from the jurisdiction of the Court because he is China's former head of state. Citing Supreme Court

4

precedent that the Court discusses below, the government maintains that courts are bound by the Executive Branch's determinations of immunity. Plaintiffs argue that although such deference was once the rule, courts are no longer bound by suggestions of immunity and that immunity is not appropriate in this case because head-of-state immunity does not shield former heads of state.

The enactment of the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. § 1602 *et seq.*, altered the practice of court deference to the Executive Branch's immunity suggestions on behalf of foreign states. *See Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486-88 (1983). Whereas under traditional practice immunity determinations were made by the Executive Branch, the FSIA placed that responsibility -- at least with regard to states – in the courts. 28 U.S.C. § 1602 ("Claims of foreign states to immunity should henceforth be decided by courts of the United States. . . ."). Although plaintiffs acknowledge that the FSIA does not govern the immunity claims of individuals, they maintain that "the principle embodied in the FSIA to treat [immunity] claims through the judicial process rather than diplomatically [also applies] to immunity claims raised by government officials." Pls.' Mem. on Preliminary and Jurisdictional Issues at 2 (hereinafter Pls.' Mem.).

The Court has recently considered the deference that must be accorded the Executive Branch's suggestions of immunity for heads of state as well as the effect that the FSIA's enactment had on the immunity-suggestion procedure. The following discussion is taken largely from the Court's opinion in *Abiola v. Abubakar*, 267 F. Supp. 2d 907 (N.D. Ill. 2003).

Under traditional common law, a foreign head of state was absolutely immune from suit in United States courts. The Supreme Court articulated this principle of customary international

law in its 1812 decision, *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812).[4] Although *The Schooner Exchange* held merely that an armed ship of a friendly foreign state was exempt from the jurisdiction of United States courts, the decision "came to be regarded as extending virtually absolute immunity to foreign sovereigns." *Verlinden*, 461 U.S. at 486. Sovereign immunity was premised on the notions of comity and the equal dignity of nations. A ruler could not be seen to "degrade the dignity of his nation by placing himself or its sovereign rights within the jurisdiction of another." *The Schooner Exchange*, 11 U.S. (7 Cranch) at 137. A head of state's immunity was premised on the concept that a foreign state and its ruler were one and the same; the "prince" was deemed to be the personification of the sovereign state. *The Schooner Exchange* reflects this conflation; throughout the opinion Chief Justice Marshall makes no distinction between the sovereign as state and the sovereign as ruler.

As the principles articulated in *The Schooner Exchange* evolved into a general doctrine of foreign sovereign immunity, the courts consistently "deferred to the decisions of the political branches – in particular, those of the Executive Branch – on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities." *Verlinden*, 461 U.S. at 486. The Supreme Court articulated the rationale for such deference:

> [I]t is a guiding principle in determining whether a court should exercise or surrender its jurisdiction . . . , that the courts should not so act as to embarrass the executive arm in its conduct of foreign affairs. "In such cases the judicial department of this government follows the action of the political branch, and will not embarrass the latter by assuming an antagonistic jurisdiction." It is therefore not for the courts to deny an immunity which our government has seen fit to allow, or to allow an immunity on new grounds which the government has not seen fit to recognize.

---

[4]The Supreme Court did, however, leave open the possibility that a "prince" may not be immune for his purely private ventures. *See The Schooner Exchange*, 11 U.S. (7 Cranch) at 145.

*Republic of Mexico v. Hoffman*, 324 U.S. 30, 35 (1945) (quoting *United States v. Lee*, 106 U.S. 196, 209 (1882)). Thus emerged a system under which the State Department determined the availability of sovereign immunity, and the courts deferred to its decisions. *Verlinden*, 461 U.S. at 487.

Until 1952, the State Department "ordinarily requested immunity in all actions against friendly foreign sovereigns." *Id.* at 486. In that year, however, the State Department adopted the "restrictive theory" of immunity, under which the Executive Branch would recognize immunity only for a foreign sovereign's public acts, not its commercial or private activities. *See* Letter from Jack B. Tate, Acting Legal Adviser, Department of State, to Philip B. Perlman, Acting Attorney General (May 19, 1952), *reprinted in Alfred Dunhill v. Republic of Cuba*, 425 U.S. 682 (1976). The practical application of the restrictive theory proved troublesome, however. *Verlinden*, 461 U.S. at 487. Foreign states faced with litigation in United States courts often exerted diplomatic pressure on the State Department, which resulted in inconsistent, and sometimes embarrassing, outcomes. In 1976, Congress passed the FSIA to "free the Government from case-by-case diplomatic pressures, to clarify the governing standards, and to 'assur[e] litigants that . . . decisions are made on purely legal grounds and under procedures that insure due process.'" *Id.* at 488 (quoting H.R. Rep. No. 94-1487, at 7 (1976) (hereinafter H.R. Rep.)) (alterations in original). The FSIA did so by transferring immunity determinations for states from the State Department to the courts. *See* 28 U.S.C. § 1602 (findings and declaration of purpose).

Plaintiffs maintain that although the FSIA does not apply to heads of state, the statute's elimination of the immunity-suggestion procedure for foreign states also displaced the suggestion

7

procedure for heads of state. Plaintiffs thus urge the Court to make an independent determination regarding the availability of immunity for Jiang rather than defer to the Executive Branch's suggestion.

Neither the FSIA's text nor its legislative history, however, indicates an intent to alter the traditional suggestion procedure with respect to heads of state. The FSIA's definition of "foreign state" noticeably omits heads of state. "Foreign state" is defined to include an "agency or instrumentality of a foreign state," which is further defined as "any *entity* (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof." *Id.* § 1603(b) (emphasis added). The House Report's discussion of the definition of "foreign state" further underscores the Act's applications to states *qua* states and state entities, not heads of state. The FSIA's reference to a foreign state's "agency or instrumentality" is meant to cover

> a state trading corporation, a mining enterprise, a transport organization such as a shipping line or airline, a steel company, a central bank, an export association, a governmental procurement agency or a department or ministry which acts and is suable in its own name.

H.R. Rep. at 16. Although the term "foreign state" is thus to be read broadly enough to cover such entities, there is no indication that heads of state are to be included in the definition.[5]

---

[5]In fact, references in the legislative history suggest that the opposite is true. During Congressional deliberations on the FSIA, a witness from the Department of Justice described how the proposed legislation would enable suits against foreign state-owned enterprises – such as Lufthansa, West Germany's national airline. Notably, however, he emphasized, "Now we are not talking, Congressmen, in terms of permitting suit against the Chancellor of the Federal Republic. . . . That is an altogether different question." Immunities of Foreign States: Hearing on H.R. 3493 Before the Subcomm. on Claims and Governmental Relations of the House Comm. on

(continued...)

Moreover, the Act's legislative history indicates that it was not meant to affect diplomatic or consular immunity: "Section 1605(a)(5) would not govern suits against diplomatic or consular representatives but only suits against the foreign state." H.R. Rep. at 21.

It is logical to infer from the FSIA's legislative history and the omission of heads of state from the definition of "foreign state" that the statute was not intended to alter traditional immunity for heads of state. *See Tachiona v. Mugabe*, 169 F. Supp. 2d 259, 277 (S.D.N.Y. 2001) ("With a legislative record devoid of any explicit contrary expression, a deliberate purpose to depart from generally prevalent international customs and practices as regards immunity for heads-of-state should not be ascribed to Congress."). The pre-1976 suggestion of immunity procedure thus survives the statute's enactment with respect to heads of state. The Court must defer to the United States's suggestion of immunity for Jiang, *Republic of Mexico*, 324 U.S. at 35, and we therefore dismiss all claims made by the plaintiffs against him.

In reaching this determination, we join several courts that have concluded that the immunity-suggestion procedure remains intact with respect to heads of state. *See United States v. Noriega*, 117 F. 3d 1206, 1212 (11th Cir. 1997) ("Because the FSIA addresses neither head-of-state immunity, nor foreign sovereign immunity in the criminal context, head-of-state immunity could attach in cases, such as this one, only pursuant to the principles and procedures outlines in *The Schooner Exchange* and its progeny. As a result, this court must look to the Executive Branch for direction on the propriety of Noriega's immunity claim."); *Leutwyler v. Office of her Majesty Queen Rania Al-Abdullah*, 184 F. Supp. 2d 277, 280 (S.D.N.Y. 2001) (dismissing all

---

⁵(...continued)
the Judiciary, 93d Cong. 16 (1976) (statement of Bruno Ristau, Chief, Foreign Litigation Unit, Civil Division, Department of Justice).

9

claims against Queen Rania because the government filed a suggestion of immunity); *Tachiona*, 169 F. Supp. 2d at 290 ("[T]he Executive Branch's role in determinations of head-of-state immunity was not affected by the passage of the FSIA."); *First Am. Corp. v. Al-Nahyan*, 948 F. Supp. 1107, 1119 (D.D.C. 1996) ("[T]he enactment of the FSIA was not intended to affect the power of the State Department . . . to assert immunity for heads of state or for diplomatic and consular personnel."); *Lafontant v. Aristide*, 844 F. Supp. 128, 137 (E.D.N.Y. 1994) ("The language and legislative history of the FSIA, as well as case law, support the proposition that the pre-1976 suggestion of immunity procedure survives the FSIA with respect to heads-of-state."); *Alicog v. Kingdom of Saudi Arabia*, 860 F. Supp. 379, 382 (S.D. Tex. 1994) (dismissing claims against King Fahd because the United States intervened to acknowledge his status as head of state), *aff'd*, 79 F.3d 1145 (5th Cir. 1996) (unpublished table decision); *Kline v. Kaneko*, 535 N.Y.S. 2d 303, 304 (N.Y. Sup. Ct. 1988) ("The FSIA made no change . . . in the State Department's power to suggest immunity for foreign heads of state . . . ."; dismissing suit against wife of Mexican president because State Department suggested immunity); *see also Kadic v. Karadzic*, 70 F.3d 232, 248 (2d Cir. 1995) (declining to extend head-of-state immunity to defendant where the Executive Branch refused to acknowledge immunity).

Although the Court finds the government's suggestion of immunity dispositive, we nevertheless address plaintiffs' arguments as to why immunity should not be recognized in this case. First, plaintiffs argue that because the government has accepted the role of *amicus curiae*, its assertion of immunity should not be given the deference that courts have traditionally afforded "Official Suggestions of Immunity." Pls.' Mem. at 36. The Court, however, fails to see – and plaintiffs have not cited any persuasive authority to support – the significance of this distinction.

The government has intervened in this litigation pursuant to 28 U.S.C. § 517, which permits a delegate of the Attorney General "to attend to the interests of the United States." The statute ensures an avenue for the interests of the United States to be heard in cases where the government is not a party, but it does not mandate a specific form of intervention. To suggest that the government's *amicus* brief does not have the same status as a suggestion of immunity is to elevate formality over function. The United States's brief *is* a suggestion of immunity. Even if the brief were not clearly marked as a suggestion of immunity, which it is, its content makes amply clear that the Executive Branch, via the State Department, has recognized Jiang's head-of-state immunity and urges the Court to dismiss the claims against him for this reason. *See, e.g.,* Corrected United States Statement of Interest, Ex. E (Letter from William H. Taft IV, Legal Adviser, Department of State, to Robert D. McCallum, Jr., Assistant Attorney General (Dec. 6, 2002)) ("The Department of State recognizes and allows the immunity of President Jiang from this suit.").

Plaintiffs also contend that head-of-state immunity does not shield former heads of state. Although Jiang may at one time have enjoyed head-of-state immunity, they argue, he no longer has this protection because he is no longer China's head of state. In support of this argument, plaintiffs rely on the policy behind head-of-state immunity. They contend that the government recognizes the immunity of foreign heads of state to ensure that United States officials "will not be unnecessarily subjected to litigation in the courts of foreign states by making their counterpart[s] immune" from litigation in our courts. Pls.' Mem. at 29-30. They maintain that the purpose of head-of-state immunity is "to avoid the disruption of foreign relations"– a purpose which they claim is "not relevant after a head of state leaves office" – and that insofar as head-of-

11

state immunity exists to avoid "potential embarrassment to the U.S. Government in the carrying out of our foreign policy," this justification "disappears when the foreign official in question leaves office, since the basis for producing conflict with foreign policy considerations is eliminated at that point." *Id.* at 31.

Plaintiffs cite no holding by any court that head-of-state immunity for acts committed during one's tenure as ruler disappears when a leader steps down. The Second Circuit has stated in *dictum* that "there is respectable authority for denying head-of-state immunity to former heads-of-state." *In re Doe*, 860 F.2d 40, 45 (2d Cir. 1988). However, the cases the court cited in support of this proposition suggest merely that a former head of state may not be entitled to immunity (1) for his private acts, *see The Schooner Exchange*, 11 U.S. (7 Cranch) at 145; *Republic of Philippines v. Marcos*, 806 F.2d 344, 360 (2d Cir. 1986) (stating in dicta that head-of-state immunity may not "go[] so far as to render a former head of state immune as regards his *private* acts" (emphasis added)), or (2) when the foreign state waives the immunity of its former leader, *see In re Grand Jury Proceedings*, 817 F.2d 1108, 1111 (4th Cir. 1987). Neither scenario is present here. Moreover, the cornerstones of foreign sovereign immunity, comity and the mutual dignity of nations, are not implicated by denying immunity in the types of matters cited in *Doe* – in the first scenario because the head of state is being sued for acts taken as a private person and in the second because the foreign state disavows immunity for its former leader. By contrast, the rationale for head-of-state immunity is no less implicated when a former head of state is sued in a United States court for acts committed while head of state than it is when a sitting head of state is sued.

Plaintiffs also contend that immunity should not be recognized in the context of the types

12

of wrongs alleged in their complaint. Violations of *jus cogens* norms, they maintain, are outside the scope of immunity protections. However, the opposite actually seems to be true. At common law, heads of state and foreign states enjoyed coextensive immunity until the FSIA limited the situations in which immunity would be recognized for states. *Abiola*, 267 F. Supp. 2d at 911-14. A head of state, like the state itself, can therefore be understood to enjoy any immunity that states retain after the FSIA's enactment. *Id.* at 916. States are immune from claims arising from the alleged "abuse of the power of [a state's] police" because, "however monstrous such abuse undoubtedly may be, a foreign state's exercise of the power of its police has long been understood for purposes of the restrictive theory as peculiarly sovereign in nature." *Saudi Arabia v. Nelson*, 507 U.S. 349, 361 (1993). *A fortiori*, the same is true for a head of state.

**B.      Defendant Falun Gong Control Office**

The Court now considers whether this lawsuit can proceed against the defendant Falun Gong Control Office.

*1.      Inviolability*

Plaintiffs argue that even if head-of-state immunity shields Jiang from the Court's jurisdiction, such protection does not extend to the Falun Gong Control Office, which – they claim – was properly served with process through service on Jiang. The government maintains that because Jiang enjoys head-of-state immunity, he is personally inviolable and thus incapable of being served in any capacity. It argues that for this reason, Jiang could not properly be served as an agent for Office 6/10.

Personal inviolability is a core attribute of diplomatic immunity. Satow's Guide to Diplomatic Practice 120 (Lord Gore-Booth ed., 5th ed. 1979) (hereinafter Satow's Guide)

13

("Personal inviolability is of all the privileges and immunities of missions and diplomats the oldest established and the most universally recognized . . . ."). The Vienna Convention on Diplomatic Relations provides that "[t]he person of a diplomatic agent shall be inviolable." Vienna Convention on Diplomatic Relations, art. 29, *done* Apr. 18, 1961, *United States accession*, Dec. 13, 1972, 23 U.S.T. 3227, 500 U.N.T.S. 95 (hereinafter Vienna Convention). And a visiting head of state is "given the same personal inviolability . . . [as] an accredited diplomat." Restatement (Third) of Foreign Relations Law § 464, note 14 (1987). According to the Vienna Convention, inviolability means that the "diplomatic agent . . . shall not be liable to any form of arrest or detention. The receiving State shall treat him with due respect and shall take all appropriate steps to prevent any attack on his person, freedom or dignity." Vienna Convention, art. 29. This articulation of the principle is consistent with its origins – a diplomat serving his country on potentially hostile foreign territory required personal inviolability "to allow him to perform his functions without any hindrance from the government of the receiving state." Satow's Guide at 120-21. In addition to arrest and detention, the case law addressing inviolability involves, for example, searches of the person, baggage or premises; subpoenas to provide evidence at legal proceedings; and initiation of criminal or civil proceedings against a diplomat who claims immunity. *See Tachiona*, 169 F. Supp. 2d at 304.

The question in this case is whether this inviolability is broad enough to insulate Jiang from all service of process, even process directed at a third party entity with which he is claimed to be associated. Several factors lead the Court to conclude that inviolability does not operate as a barrier to service of process in such a situation. First, the justifications for inviolability and immunity – that a foreign diplomat should not be hindered in his official functions and that a

14

foreign nation should not suffer an affront to its dignity – are clearly implicated if legal compulsion is asserted directly against a head of state. But these concerns are not implicated to the same degree when service of process is related, not to the assertion of jurisdiction over the head of state himself, but to jurisdiction over a third-party organization. *Cf. Tachiona*, 169 F. Supp. 2d at 305 ("Service of process . . . would not demand the official's appearance in court nor subject him in other ways to the court's compulsory powers in a manner that could be deemed an assertion of territorial authority over the foreign dignitaries and, by extension, over the foreign state they represent.").

Second, the service provisions of the FSIA suggest that personal inviolability does not present an absolute bar to service in an agency capacity. The Act provides that one way to effect service on an agency or instrumentality of a foreign state is "by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States." 28 U.S.C. § 1608(b)(2). Nothing in the statute would prevent service to be effected through an officer who "also happens to be a state official or diplomat otherwise entitled to immunity – theoretically including even a head-of-state who satisfies the statutory criteria defining the persons upon whom service is authorized to be made." *Tachiona*, 169 F. Supp. 2d at 306. Because the FSIA does not foreclose the possibility that a diplomat may receive process as an agent, the statute lends weight to the proposition that inviolability does not bar service under all circumstances.

And perhaps the strongest indication that inviolability does not always preclude service is the possibility that heads of state may not be immune in all situations. As far back as 1812 the

15

Supreme Court, when articulating the principle of sovereign immunity in *The Schooner Exchange*, indicated the possibility that, although a prince was absolutely immune for his official acts, he could be subject to suit for certain private acts: "A prince, by acquiring private property in a foreign country, may possibly be considered as subjecting that property to the territorial jurisdiction; he may be considered as so far laying down the prince, and assuming the character of a private individual." *The Schooner Exchange*, 11 U.S. (7 Cranch) at 145. Likewise, international law permits actions against heads of state involving real property abroad, private services as an executor of an estate, or personal commercial activities. *See* Vienna Convention, art. 31; Satow's Guide at 10. These limited exceptions to immunity presuppose that a head of state is amenable to service of process, even in instances when his presence in court may be required. Service of process therefore cannot be seen under all circumstances to be an affront to a head of state's inviolability.

    *B.    Service on Office 6/10*

    Although inviolability does not necessarily prevent service on Jiang in an agency capacity, that does not resolve the matter. Jiang could be properly served on behalf of Office 6/10 only if he was an officer or agent of that entity. Federal Rule of Civil Procedure 4(h) provides that service on a foreign corporation or unincorporated association can be effected either "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process," or pursuant to the law of the state in which the district court is located. Fed. R. Civ. P. 4(h)(1); *see also* Fed. R. Civ. P. 4(e)(1). Under Illinois law, a private corporation may be served "by leaving a copy of the process with its registered agent or any officer or agent of the

16

corporation found anywhere in the State." 735 ILCS 5/2-204. The burden for serving an unincorporated association – which is defined as "any organization of 2 or more individuals formed for a common purpose, excluding a partnership or corporation," 735 ILCS 5/2-209.1 – is somewhat different. Service on an association can be achieved "by leaving a copy of the process with any officer of the association personally or by leaving a copy of the process at the office of the association with an agent of the association." 735 ILCS 5/2-205.1. Under this provision, service on any agent of Office 6/10 is insufficient; rather, service must be effected through an officer.

It is not clear whether Office 6/10 should be viewed as a corporate entity or an unincorporated association – though the latter category would appear to be closer to the mark. We therefore address whether Jiang was either an officer or an agent of Office 6/10, as required by the two Illinois statutes we have cited, or a "managing or general agent" or an agent authorized by appointment or law to receive service, as permitted by Rule 4(h). Plaintiffs maintain that Jiang properly could receive service on Office 6/10's behalf because he "was the head of the Communist Party, a member of the Politburo of the Party, and the founding official who established Office 6/10 as an entity of the Party and who provided ongoing oversight and direction for its work." Pls.' Mem. at 43. Throughout the plaintiffs' submissions, they assert that Jiang, by virtue of his role as head of the Chinese Communist Party, controlled and supervised the activities of Office 6/10. *See, e.g., id.* at 42 (Office 6/10 was "subject to the control and supervision of Jiang as head of [the Communist] party."); Compl. ¶ 40 (As Secretary General of the Central Committee of the Chinese Communist Party, Jiang "exercised command authority over" Office 6/10.). Plaintiffs also maintain that, when served, Jiang was present in

17

Chicago as "an agent of his political party's Office 6/10." Compl. ¶ 8.

These submissions, however, do not amount to a showing that Jiang was either an agent or an officer of Office 6/10. The claim that Jiang established the Office and exerted control over it in his capacity as leader of the ruling party does not by itself mean that he was, at the time process was supposedly served, an agent or an officer of the Office. Without something more definitive than plaintiffs' conclusory allegations of agency, the Court cannot determine whether Jiang was in fact an agent or officer of Office 6/10.

## C. *Personal Jurisdiction*

Although the Court is not convinced that Jiang properly could be served in an agency capacity on behalf of Office 6/10, we nevertheless consider the next question in the analysis: assuming Jiang was an agent of Office 6/10, was service on him effective to establish the Court's personal jurisdiction over the Office?

Plaintiffs suggest that personal jurisdiction exists pursuant to Federal Rule of Civil Procedure 4(k)(2). Rule 4(k)(2) provides that, with respect to claims arising under federal law, "[i]f the exercise of jurisdiction is consistent with the Constitution and laws of the United States," service of summons is effective "to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state." According to the Advisory Committee notes following the Rule, this provision was intended to allow for jurisdiction over a nonresident of the United States whose contacts with the United States are "sufficient to justify the application of United States law . . . but [that has] insufficient contact with any single state to support jurisdiction under state long-arm legislation or meet the requirements of the Fourteenth Amendment limitation on state court territorial jurisdiction."

Fed. R. Civ. P. 4(k)(2), 1993 Advisory Committee Notes. For personal jurisdiction to be achieved under this Rule, the defendant must have "affiliating contacts with the United States sufficient to justify the exercise of personal jurisdiction over that party," and must not be subject to personal jurisdiction in any state. *Id.* Although plaintiffs seem to claim that they may benefit from this Rule, *see* Pls.' Mem. at 45 n.29, they also, inconsistently, maintain that Jiang is subject to the jurisdiction not only of Illinois, but of other states as well, *id.* at 44. Plaintiffs thus have failed to show, as required by Rule 4(k)(2), that Office 6/10 is not amenable to suit in any state.

Federal Rule of Civil Procedure 4(k)(1)(A) provides that service of a summons establishes personal jurisdiction over a defendant if the defendant "could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located." Under Illinois law, personal jurisdiction exists based on certain enumerated bases, as well as "any other basis" permitted under the Illinois and United States Constitutions. 735 ILCS 5/2-209(c). Because Illinois courts have not elucidated any "operative difference between the limits imposed by the Illinois Constitution and the federal limitations on personal jurisdiction," the two constitutional analyses collapse into one. *Hyatt Int'l Corp. v Coco*, 302 F.3d 707, 715 (7th Cir. 2002).

Federal due process permits personal jurisdiction over a nonresident defendant when it has had "certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). What is meant by "minimum contacts" depends on whether general or specific jurisdiction is asserted. *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1277 (7th Cir. 1997). General jurisdiction is permitted

only when a defendant has "continuous and systematic" contacts with the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984). Specific jurisdiction exists when the cause of action "arise[s] out of or relate[s] to the defendant's contacts with the forum." *Id.* at 414 n.8. Plaintiffs claim that both specific and general jurisdiction are available. Pls.' Mem. at 43-45.

In considering whether general jurisdiction exists, we must determine whether Office 6/10's contacts with Illinois are "continuous and systematic." *Helicopteros*, 466 U.S. at 416. The exercise of general jurisdiction is a significant assertion of a court's power because it "allows a defendant to be sued in that state regardless of the subject matter of the lawsuit." *Logan Productions, Inc. v. Optibase, Inc.*, 103 F.3d 49, 52 (7th Cir. 1996). Therefore "the constitutional requirement for general jurisdiction is 'considerably more stringent' than that required for specific jurisdiction." *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 787 (7th Cir. 2003) (quoting *United States v. Swiss American Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001)); *see also Int'l Shoe*, 326 U.S. at 318 (indicating that a court can assert general jurisdiction over a corporate defendant only when "continuous corporate activity within a state [is] thought so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities"). The Seventh Circuit has stated that contacts, to be considered "continuous and systematic,"

> must be so extensive to be tantamount to [the defendant's] being constructively present in the state to such a degree that it would be fundamentally fair to require it to answer in an [Illinois] court in *any* litigation arising out of *any* transaction or occurrence taking place *anywhere* in the world.

*Purdue*, 338 F.3d at 787 (emphasis in original); *see also Bancroft & Masters, Inc. v. Augusta*

20

*Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000), *cited in Purdue*, 338 F.3d at 787 n.16 (general jurisdiction "requires that the defendant's contacts be of the sort that approximate physical presence").

Office 6/10's alleged contacts with Illinois cited by plaintiffs are the following: (1) the creation of a "blacklist" of Falun Gong supporters on which seven Illinois residents appear – plaintiffs allege that "the government of China" has used the list to pressure airlines to deny passage to anyone appearing on the list seeking to travel to sites visited by Jiang, Pls.' Mem. at 44; (2) the persecution, detention, and torture in China of "at least six individuals who have since become residents of Illinois," *id.*; and (3) activities aimed at monitoring and suppressing Falun Gong demonstrations within Illinois, such as assaults on demonstrators, intimidation of Chicago hotels in order to prevent their hosting of Falun Gong activities, and the destruction of leaflets and signs at Falun Gong demonstrations.

Office 6/10's alleged creation of a blacklist on which the names of seven Illinois residents happen to appear does not constitute a contact with Illinois. The list evidently was created in China, and as best as we can tell, without regard to the residency of the persons named. The persecution, torture, and detention in China of individuals who later became Illinois residents is likewise not a contact by Office 6/10 with Illinois. The alleged atrocities occurred in China; the fact that the victims later became Illinois residents is insufficient to confer jurisdiction. *Purdue*, 338 F.3d at 780 ("[I]t must be the activity of the defendant that makes it amenable to jurisdiction, not the unilateral activity of the plaintiff or some other entity."); *cf. Helicopteros*, 466 U.S. at 417 (suggesting that "unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to

21

justify an assertion of jurisdiction"); *Hanson v. Denckla*, 357 U.S. 235, 253 (1958) ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.").

Office 6/10's alleged attempts to suppress Falun Gong demonstrations in Illinois through the assault of demonstrators, intimidation of Chicago hotels, and the destruction of leaflets and signs are, obviously, contacts with Illinois. But although these contacts may have occurred on more than one occasion, they do not rise to the level of "continuous and systematic" contacts, such that Office 6/10 "could reasonably foresee being haled into court in [Illinois] for *any* matter," *Purdue*, 338 F.3d at 787 (emphasis added), even a case unrelated to those contacts. Nor do they equate to the constructive presence of Office 6/10 in Illinois. *Id.* Although such activities may potentially confer specific jurisdiction for claims arising from those activities, they do not justify the assertion of general jurisdiction.

We next consider the availability of specific jurisdiction. As stated above, for specific jurisdiction to exist, the plaintiffs' claims must arise from the defendant's contacts with the forum. In this case they do not. As we stated above, the only activity by Office 6/10 amounting to a contact with Illinois is its alleged acts related to Falun Gong demonstrations in Illinois. None of plaintiffs' claims, however, arise from these activities. Plaintiffs A, B, C, D, E, and F's claims arise from atrocities allegedly inflicted on them in China.[6] Plaintiffs Wei Ye and Hao Wang's claims are related to their appearance on the blacklist. Although the appearance of Wei Ye, an Illinois resident, on the alleged blacklist does not amount to a contact by Office 6/10 with

---

[6] Moreover, there is no indication that the six current Illinois residents that were detained and tortured in China are plaintiffs in this case. In fact, the complaint does not suggest that plaintiffs A, B, C, D, E, or F are Illinois residents. *See* Compl. ¶¶ 13-18.

22

Illinois, a few things are nevertheless worth mentioning. Plaintiffs state that it was the Chinese government, not Office 6/10, that used the blacklist to pressure airlines into denying passage to persons named on it. Pls.' Mem. at 44. According to the complaint, at the behest of the Chinese government, Iceland's Ministry of Justice directed Icelandair to deny passage to Mr. Ye. Compl. ¶¶ 21, 45. But he traveled to Minnesota to board the Icelandair flight; it was in that state, not Illinois, where he was prevented from boarding. It therefore appears that any contact initiated by the Chinese government in this regard was with Iceland, not Illinois, and had an effect in Minnesota, not Illinois. Plaintiff Hao Wang was not prevented from boarding his flight, which originated in Boston. Rather, he was detained by Icelandic officials after his arrival in that country. Compl. ¶ 22.

Based on the foregoing, even if Jiang was an agent or officer of Office 6/10 and thus capable of receiving service on its behalf, such service was insufficient to confer personal jurisdiction over Office 6/10 because the Office is not subject to the jurisdiction of Illinois courts. *See* Fed. R. Civ. P. 4(k)(1)(a). Because the Court lacks personal jurisdiction over the Falun Gong Control Office, we dismiss the claims against it.

Although the Court dismisses the claims against Office 6/10 on the basis of lack of personal jurisdiction, there is a significant possibility that the Foreign Sovereign Immunities Act applies to the claims against this entity. The FSIA provides that, subject to certain exceptions, foreign states and their agencies and instrumentalities are immune from suit in United States courts. 28 U.S.C. §§ 1603-05. Plaintiffs maintain that the Falun Gong Control Office is a subdivision of China's Communist Party and as such is a private entity. *See, e.g.*, Pls.' Mem. at 42; Aff. of Andrew Nathan ¶ 7. Although they claim that "[a]t no time during its operation was

23

Office 6/10 considered a government entity," plaintiffs acknowledge that "as a practical and functional matter [the Falun Gong Control Office] played a major role in controlling and supervising the activities of a number of governmental agencies involved in law enforcement, judicial and propaganda dissemination activities." Pls.' Mem. at 42; *see also* Aff. of Andrew Nathan ¶ 3 (noting that the Chinese Communist Party and Chinese government are "constitutionally and organizationally distinct" while conceding that "the Communist Party continues to control Chinese politics and government"). They state that the Office "acts under color of law and carries out law enforcement operations of a governmental nature." Compl. ¶ 7. Because of Office 6/10's practical role in both supervising and mandating the actions of government actors and because of the intimate link between the government and the ruling party in China, a significant question exists as to whether the Falun Gong Control Office is an "agency or instrumentality" of the Chinese state. If so, it would be entitled to sovereign immunity under the FSIA, and the Court would lack subject matter jurisdiction over the claims against it. *See Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 373 (7th Cir. 1985) ("[T]he absence of sovereign immunity is a prerequisite to subject matter jurisdiction."). In light of the Court's determination that personal jurisdiction over Office 6/10 is lacking, however, we need not address this issue. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574 (1999) (court may dismiss case for lack of personal jurisdiction before considering issue of subject mater jurisdiction).

## CONCLUSION

For the reasons stated above, the Court recognizes defendant Jiang Zemin's head-of-state immunity and dismisses the claims against him. The Court also dismisses the claims against

24

defendant Falun Gong Control Office for lack of personal jurisdiction. The Clerk is directed to

enter judgment dismissing the plaintiffs' claims. All pending motions [Nos. 3-1, 11-1, 11-2, 18-

1, 18-2] are terminated.

MATTHEW F. KENNELLY
United States District Judge

Date: September 12, 2003